**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN A. COLLIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 08-cv-5645 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant City of Chicago's ("the City") motion for summary judgment [69]. For the reasons explained below, the Court grants summary judgment for the City and against Plaintiff on Count VII (the ADA claim) and dismisses the remaining counts without prejudice to re-filing in state court. The case is terminated and judgment is entered in favor of the City on Count VII.

**I.  Background**

Plaintiff Steven A. Collier ("Collier") filed this lawsuit in state court on August 28, 2008 [see 1]. The City subsequently removed the suit to this Court, and Collier subsequently amended his complaint [29]. The amended complaint names the City as well as two individual defendants—John Zander ("Zander") and Maureen Egan ("Egan") as Defendants. Collier's complaint comprises seven counts. Only two of them (Counts I and VII) are directed at the City; the remaining five are directed at the Individual Defendants. Count I alleges a claim of state law wrongful termination against all Defendants. Count VII names all Defendants and alleges that the City violated the Americans with Disabilities Act when it refused to provide reasonable accommodation for Collier's "medical situation cancer treatment [sic]." The remaining five

counts assert various state law causes of action and are brought against Defendants Egan and Zander only.[1] The only basis for the Court's jurisdiction over this lawsuit is Count VII, which asserts a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§, 12101 *et seq.*[2]

As an initial matter, there is no evidence on the docket that Plaintiff served Zander or Egan with the amended complaint (or with the original complaint for that matter), or requested that they waive service of summons. Defendant has submitted affidavits from both Zander and Egan in which each swears that he or she was never served. The time for serving Zander and Egan has long since expired. See Federal Rule of Civil Procedure 4(m). Accordingly, for this reason, Defendants Zander and Egan are dismissed from this lawsuit without prejudice. *Id.*

In an order of February 4, 2010, the Court denied the City's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) [50]. The City answered the complaint on March 12, 2010 [54] and amended its answer on November 30, 2010 [68]. The City filed the instant motion for summary judgment on January 31, 2011 [69], along with a memorandum in support thereof [70], and its Local Rule ("L.R.") 56.1 statement of material facts [71] (hereinafter "City SOF"). The only response that Plaintiff made to the motion was a perfunctory, three-page brief that cites no case law and fails to meaningfully respond to Defendants' arguments. Plaintiff filed no response to the City's statement of facts, as is required by L.R. 56.1(b)(3). In its reply [73], filed on March 14, 2011, the City pointed out the patent inadequacies in Plaintiff's response to its motion, and argued that the Court should accept the City's statement of facts as true. Even after receiving the reply, Plaintiff has not asked for leave to amend its response, nor has Plaintiff asked for leave to file a sur-reply to address the City's arguments in this regard.

---

[1] While the Counts are labeled I through IX, there is no Count II or Count VI.

[2] The Court has supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367.

Because Plaintiff has failed to controvert the City's statement of facts, the Court deems those facts admitted so far as they are supported by admissible record evidence.[3] See Local Rule ("L.R.") 56.1(b)(3)(C); *Bell, Boyd, & Lloyd v. Tapy*, 896 F.2d 1101, 1102 (7th Cir. 1990). For the reasons explained below, the Court need only consider a few facts in order to resolve this motion.

Plaintiff worked for the City from June 30, 1994, until his termination on September 13, 2006. At the time of his termination, Plaintiff was a Hoisting Engineer with the Chicago Department of Water Management. His job duties included driving and operating heavy equipment. During his employment with the City Plaintiff was a member of the International Union of Operating Engineers Local 150.

On Monday, August 21, 2006, Plaintiff "got sick at work" after running over a pothole while driving a piece of heavy equipment. (City SOF ¶ 27). After his "whole body went numb," Plaintiff "tried to shake it off" and continued to work for a "couple of hours." *Id*. At approximately 2:00 p.m., Plaintiff, whose shift ended at 3:30 p.m., returned the piece of heavy equipment to the depot and told Acting Foreman James McDonald that he "felt ill." *Id*. McDonald said, "Do what you need to do." *Id*.

After leaving work on August 21, 2006, Plaintiff drove himself to Little Company of Mary Hospital, in Evergreen Park, Illinois. Plaintiff remained at the hospital overnight, but was

---

[3] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. L.R. 56.1(b)(3)(C) provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

not admitted. Before leaving the hospital on August 22, 2006, Plaintiff did not receive a diagnosis, nor did he request a doctor's note.

In the morning of August 22, 2006, after leaving the hospital, Plaintiff went home and got in bed. He was not experiencing any symptoms other than numbness at that time. Plaintiff was not on medication, and he had the ability to walk, talk, use his hands, and make telephone calls at that time.

On August 23 or 24 of 2006, Plaintiff saw his primary doctor, Reuben Nichols. Plaintiff drove himself to Dr. Nichols' office. During that visit, Plaintiff told Dr. Nichols that he "got sick at work" and that he was experiencing "[j]ust numbness." (City SOF ¶ 30). Dr. Nichols did not give Plaintiff a diagnosis or medication at that time.

On August 22, 23, and 24 of 2006, Plaintiff did not work, and he cannot recall speaking with any City employee on those dates.

On August 25, 2006, Plaintiff went to the Department's offices and spoke with James Breslan ("Breslan"), Superintendent of Hoisting Engineers, and Robert Law ("Law"), a union steward for Local 150, Plaintiff's Union. Plaintiff told Breslan and Law that he was "sick" and was "still trying to figure out what's going on." (City SOF ¶ 33). Plaintiff told them nothing about his sickness other than his "whole body was numb." *Id*. Breslan responded, "[t]ake care of yourself and do what you got to do." *Id*. Law told Plaintiff to "[t]ake care of yourself and get well." *Id*. That same day, Plaintiff also talked to Zander, his Labor Relations Supervisor. Plaintiff told Zander that he was "sick" and was "trying to figure out what's going on." (City SOF ¶ 34). Zander responded, "Do what you got to do." *Id.* On that date, Plaintiff did not give Zander, Breslan, or Law a doctor's note indicating how long he would be off work, and he cannot recall whether he gave them any medical records at that time.

On August 28, 2006, Plaintiff called a City phone number that he believed to be Breslan's to let Breslan know that he was "sick" and "didn't know when [he] was going to be back." (City SOF ¶ 34). That same day, Plaintiff also called a City number that he believed to be Zander's because he "he didn't want any nonsense going on about [him] being off * * * being sick." *Id*. Plaintiff cannot recall whether he spoke with, or left messages for, Breslan or Zander on that date. However, on August 28, 2006, Plaintiff completed a Report of Occupational Injury or Illness ("Report") regarding his August 21, 2006 incident at work. Plaintiff wrote on the Report as a description of his illness or injury: "[w]hile in machine, jerked back!" (City SOF ¶ 38).

On August 28, 29, and 30 of 2006, Plaintiff was able to walk, talk, and drive. On August 30, 2006, Plaintiff drove himself to Mercy Hospital to see Dr. Jeffrey Kramer, a neurologist to whom Plaintiff was referred by Dr. Nichols. Dr. Nichols referred Plaintiff to Dr. Kramer because Dr. Nichols "couldn't figure out what the problem was." (City SOF ¶ 40). On a "Patient Information" form at the hospital, under the heading "Workman's Comp. Info.," and in response to the question, "Was this injury work related," Plaintiff marked an "x" next to "Yes." Plaintiff told Dr. Kramer only that his "whole body was numb," as he was experiencing no other symptoms. Plaintiff was admitted to the hospital at that time and was released the next day. Between September 1, 2006, and September 13, 2006, Plaintiff did not see a doctor, and he cannot recall whether he went to the hospital. Plaintiff's "numbness" dissipated a few weeks after being placed on shots at Mercy Hospital.

Plaintiff believes that he spoke to Breslan during the first week of September, 2006. At that time, Plaintiff told Breslan that he "didn't know how long [he] was going to be off" and that

5

he was "still sick."  (City SOF ¶ 42).  Breslan replied, "Good luck and do what you got to do." *Id*.  Plaintiff did not ask Breslan about requesting medical leave.

Plaintiff does not believe he talked to any City employee between August 25, 2006, and September 12, 2006, regarding his illness.  Plaintiff missed 11 days of work between August 25 and September 12, 2006.  Plaintiff did not attempt to request medical leave prior to September 12, 2006, because he "wasn't for sure how long [he] was going to be off."  (City SOF ¶ 45).  Plaintiff knew that he had to call in to work if he was going to be absent, and he knew that being absent for five days without notifying the Department would result in a "break-in-service," pursuant to Section 8.4 of the collecting bargaining agreement that governed his employment.

The City terminated Plaintiff's employment on September 13, 2006.  The September 13, 2006 break-in-service letter informed Plaintiff that he had been "absent from work for over five (5) consecutive work days without notifying the Department."  (City SOF ¶ 49).  The letter further stated, "In accordance with Section 8.4 of the [CBA], your absences have caused a break in service and as a result, your employment relationship with the City is terminated effective today, September 13, 2006."  *Id*.  The letter also advised Plaintiff that if there were circumstances that prevented him, or someone on his behalf, from notifying the Department of his absences from work, he should submit a written response explaining those circumstances within five days of Plaintiff's receipt of the letter.

On September 18, 2006, Plaintiff dropped off a handwritten response to the September 13, 2006 break-in-service letter.  The response stated:  "On August 21, I became sick at work, I've been in & out of the hospital. On 8-23, I gave John Zander a copy of my doctors statement, also Mike Breslan. I've been diagnosed with M.S. This unwarranted stress from the City is not

needed or valid!" (City SOF ¶ 51).[4] Plaintiff also attached a document to his response that he received from the hospital titled "Instructions to Patient."

On September 25, 2006, Spatz replied to Plaintiff's September 18, 2006 response. The September 25, 2006 letter stated, in part, that the document Plaintiff attached to his response, the "Instructions to Patient," only "list[ed] medications prescribed and a handwritten diagnosis that is not legible"—it did not identify Plaintiff as the patient, did not offer a legible diagnosis, was not signed by a doctor, and was not on any type of letterhead that identifies a hospital, clinic or doctor's office. (City SOF ¶ 53). The letter also indicated that Plaintiff had not contacted the Department since August 29, 2006.

On September 29, 2006, Spatz sent Plaintiff a third letter regarding his break-in-service. The September 29, 2006 letter indicated that Spatz had received the two documents that Plaintiff gave to Egan on September 25, 2006 – a "certification from Dr. Nichols dated 9/25/06 " and a "record from Mercy Hospital showing that [Plaintiff was] admitted on 8/30/06." (City SOF ¶ 54). The letter further stated that those two documents, which were submitted to the Department "for the first time on September 25," do not explain why Plaintiff, or someone on his behalf, was unable to "contact the Department * * * between August 29 and September 13." *Id*.

Plaintiff testified that in August and September of 2006, his illness made it "hard to stand * * * [and] to hold anything." (City SOF ¶ 70) Plaintiff was able to walk, stand, and hold things in August and September 2006. *Id*. Plaintiff testified that the effect his illness currently has "varies": his "memory just goes in and out" and he has "numbness from time to time." (City

---

[4] Plaintiff testified that he believes that on August 25, 2006, and not August 23, 2006, he gave a copy of the Little Company of Mary "Emergency/Private Physician Service Record" to Zander, but he cannot recall what document he gave to Breslan on that date. (City SOF ¶ 52).

7

SOF ¶ 71). Plaintiff is not taking any medication for his illness; Plaintiff stopped receiving shots when his "insurance ran out" in January 2007. *Id.*

## II. Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III.   Analysis**

   **A.   ADA Claim**

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Under the ADA, it is unlawful for an employer to fail to make reasonable accommodations to qualified individuals with disabilities. 42 U.S.C. §§ 12112(b)(5)(A), 12112(a). Plaintiff's first claim is that the City failed to accommodate his disability. Under the ADA, a failure to make reasonable accommodations for a known disability constitutes unlawful discrimination. 42 U.S.C. §§ 12112(b)(5)(A),12112(a). In order to prevail on this claim, Plaintiff must show: "(1) [he] is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (quoting *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005)); see also *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001).

The City argues (and the Court agrees) that Plaintiff cannot satisfy any of the three elements. However, because failure to prove any one of these elements is fatal to Plaintiff's ADA claim, the Court need only focus on one of the three elements, and the Court chooses the first.

Plaintiff's ADA claim fails because he cannot establish that he was a qualified individual with a disability at the time of his termination from employment with the City. See *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998) ("The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision"). The plaintiff bears the burden of proof on the issue of whether he is a "qualified individual" under the ADA. *Id.*

The ADA[5] defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." See *id.* (quoting 42 U.S.C. § 12111(8)) (internal quotation marks omitted). Thus, Plaintiff must overcome two hurdles under the first element of his ADA claim: he must show, first, that his medical condition rendered him disabled, as defined by the ADA, and second, that he was able to perform his essential job duties, with or without accommodation. See *Mobley*, 531 F.3d at 545.

With respect to the first prong, the ADA defines "disability" as "(1) a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "his employer regards him as having such an impairment." *Fredricksen*, 581 F.3d at 521. Since it is indisputable that Plaintiff has no evidence in support of the second and third definitions, he must attempt to meet his burden under the first definition, which involves a two-step inquiry. See *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 (1999) (quoting 42 U.S.C. § 12102(2)). Initially, Plaintiff must prove that he had a physical or mental impairment. See 29 CFR § 1630.2(h). Then, he must demonstrate that his impairment substantially limited a major life activity, such as walking, seeing, and hearing. See 29 CFR § 1630.2(i). Under the applicable Equal Employment Opportunity Commission regulations, "substantially limited" means "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major

---

[5] Because the events giving rise to Plaintiff's claims occurred in 2006, the law in effect prior to the January 1, 2009 amendments to the ADA applies. See *Fredricksen v. United Parcel Serv.*, Co., 581 F.3d 516, 521 n.1 (7th Cir. 2009) ("Congress did not express its intent for [the amendments to the ADA] to apply retroactively, and so we look to the law in place prior to the amendments.").

life activity." 29 CFR § 1630.2(j)). Further, "[a]n impairment is a disability only when its impact is permanent or long term." *Brunker v. Schwan's Home Service, Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009).

Plaintiff cannot establish that he had a permanent or long-term impairment prior to September 13, 2006, when his employment was terminated. While Plaintiff alleges in his amended complaint that he was diagnosed with multiple sclerosis on or about August 24, 2006, he has produced no medical documentation, dated between August 21, 2006, and the date of his termination, which reflects such a diagnosis. Plaintiff has adduced no evidence that he was diagnosed with multiple sclerosis prior to his termination.

In addition, regardless of the name or diagnosis of Plaintiff's alleged impairment, Plaintiff cannot show that he was substantially limited in his ability to perform any major life activity at the time of his termination. See *Albertson's*, 527 U.S. at 566. Plaintiff testified that at the time of his termination his numbness only made it "hard to stand * * * [and] to hold anything." (City SOF ¶ 70). Plaintiff admitted, however, that he was able to walk, talk, use his hands, and make telephone calls on the days that he was absent from work. (City SOF ¶¶ 29, 39, 70). In fact, on August 21, 2006, Plaintiff continued to drive and operate heavy equipment for two hours after his "body went numb." (City SOF ¶ 27). Also, between August 21, 2006, and September 12, 2006, Plaintiff drove himself to the hospital, to doctor's appointments, and to City offices. (City SOF ¶¶ 28, 30, 32, 38, 40, 46). Furthermore, Plaintiff testified that his "numbness" dissipated a few weeks after he received shots on or about August 30, 2006, and that he currently experiences only occasional and intermittent numbness and memory loss, even though he does not take any medication for his condition. (City SOF ¶ 71). Under these circumstances, it was Plaintiff's burden to adduce evidence sufficient to raise a question for trial

11

regarding whether he had an impairment that substantially limited a major life activity. Plaintiff offers no evidence that would tend to show this.[6] Accordingly, the Court grants summary judgment on Count VII in favor of the City. See *Brunker*, 583 F.3d at 1008 (finding on summary judgment that the Plaintiff, who suffered from multiple sclerosis, did not have an impairment that substantially limited a major life activity, because the evidence showed only that he had "intermittent difficulties").[7]

### B. State Law Claims

As noted above, Counts III, IV, V, VI, and VIII are subject to dismissal under Federal Rule of Civil Procedure 4(m) because they are directed at Defendants Zander or Egan, who were never served. Those counts (plus Count I, which is a state law count of wrongful termination that is directed against all Defendants) are also subject to dismissal for an independent reason. Because the Court has granted summary judgment as to the only claim over which it has original jurisdiction (the ADA Claim in Count VII), it must now address whether to retain jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3). The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly,* 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget*

---

[7] Briefly, the undisputed evidence also shows that Plaintiff could not establish the second element of an ADA claim—that the City was aware of his disability. "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations – a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996); see also *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir. 1997). Plaintiff has no evidence to support his allegation that he "notified" the City of "the nature of [his] illness," on or about August 25, 2006. (Cmplt. at ¶ 13). Plaintiff's supervisors certainly knew that Plaintiff was ill, and they told him to "take care" of himself and to "do what you got to do" to get better. But the undisputed evidence shows that Plaintiff did not even suggest that he had multiple sclerosis, or any other potentially disabling condition, until after his employment had been terminated. (City SOF ¶¶ 27, 31-38, 42, 43). In fact, in his reply, Plaintiff essentially concedes that he was fired before he knew of his disability and before he could tell the City about it. (Pl. Resp. at ¶ 2).

*Constr. Co.,* 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for departing from that "usual practice"[8] in this case, the Court dismisses without prejudice the state law claims asserted in Counts I, III, IV, V, VI, VIII, and IX.

**IV. Conclusion**

For the foregoing reasons, grants summary judgment for the City and against Plaintiff on Count VII (the ADA claim) and dismisses Counts I, III, IV, V, VI, VIII, and IX without prejudice to re-filing in state court. The case is terminated and judgment is entered in favor of the City on Count VII.

Dated: May 23, 2011

Robert M. Dow, Jr.
United States District Judge

---

[8] In *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County,* 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's complaint. *Wright,* 29 F.3d at 1251. Finally, this is not a circumstance in which "it is absolutely clear how the pendent claims can be decided." *Id.*